Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Joy Cunningham presiding, case number 1-8-2702, Jill Bailey v. Mercy Hospital and Medical Center. Thank you. Good afternoon. Good afternoon. Good afternoon, Your Honors. Good afternoon, Counsel. Presiding, hearing the case with me today are Justices Maureen Connors and Sheldon Harris. Each side will have 10 minutes to give us your version of your argument. I would advise the affluent to reserve a few minutes for our rebuttal. We're not strict clock watchers, but as you know, a Zoom argument isn't exactly as it is in the courtroom. So I would ask you to try and stick as closely as you can to the time allotment, bearing in mind that we have read this case, we've read the facts, we've read the records, we've read your briefs, and everything you've submitted to us. So it behooves you to get to your most important arguments first. Whenever you're ready. Good morning, Your Honor. Please state your name before you start because everything is being recorded. Thank you. Good morning, Your Honors. Vivian Tarver Bernardo on behalf of the Plaintiff Appellant. Thank you. Good morning, Your Honors. Kathryn Weiler, W-E-I-L-E-R, on behalf of Mercy Hospital and Nurse Anderson. Good morning, Your Honors. Michael Walsh on behalf of the Connelly and Irwin Decker. Thank you. Your Honor, Plaintiff would like to reserve five minutes for rebuttal. That's fine. Thank you. Plaintiff has five arguments before this court. Given the constriction on time, Plaintiff will present two arguments today and rest on his brief for all other arguments. A party has a right to have the jury instructed on his or her theory of the case when the evidence supports it. In this instance, Plaintiff was denied this right. The purpose of the jury instruction is to instruct the jury on the applicable legal principles of law as it applies to the evidence presented. If the question before this honorable court is whether the issue instruction achieves that goal, then it is a question of law and subject to the noble review. For the jury to fulfill its purpose, two criteria must be met. First, the jury instruction must be an accurate statement of the law. Second, as determined by this court in Dovey University of the jury instruction at issue in this case, IPI civil 105.07.01 failed in both respects. First, it was an inaccurate statement of the law as it was couched in with a different instruction. Second, it was not contained. Instead of Plaintiff's proposed IPI instruction, number 11, the court submitted a hybrid instruction to the jury which consisted of a single line on informed consent couched between Plaintiff's burden instruction. As such, the jury was inadequately instructed and was therefore unable to apply the correct legal principles to the evidence submitted. This error affected Plaintiff's case in three ways. One, it affected the jury's understanding of the requisite finding of whether Dr. Jones had a duty to inform Jill of the potential risk of discharge with suspected life-threatening illnesses. Second, because the jury was not instructed on Dr. Jones' duty to inform Jill, it affected the ultimate determination of liability and modified the Plaintiff's burden of proof. In both instances, it failed. In both instances, it deprived Plaintiff of a fair trial. This reasoning is consistent with this court's ruling in Korpowsky v. Lyman, where this court determined that the modified instruction injected confusion into the jury deliberations as it required the jury to consider one aspect of an instruction over another. The committee notes on IPI 105.07.01 state, and I quote, this instruction is to be used when the case involves an allegation that the defendant failed to fully apprise the Plaintiff of relevant factors affecting the Plaintiff's decision-making process. To prevail on his claim of informed consent, Plaintiff needed to prove three factors. First, Plaintiff needed to establish that Dr. Jones had a duty to inform Jill of certain risks. Second, Plaintiff needed to establish that Dr. Jones deviated from that duty and his failure to inform Jill caused or contributed to her death. Plaintiff submitted evidence on all three factors. On the morning of March 17, 2012, Jill came under the care and treatment of Dr. Jones, Defendant Jones, at Defendant Mercy Hospital. During his care and treatment, Dr. Jones testified that he suspected that Jill had three life-threatening illnesses. First, Dr. Jones suspected that Jill had pulmonary embolism, which is blood clots in the lungs. Second, Dr. Jones testified he suspected Jill had gastrointestinal bleeding, which means actively bleeding into the stomach, esophagus, or the colon. And lastly, Dr. Jones testified that he suspected Jill was septic, that she had, which meant that she would have had blood poisoning or an overwhelming infection. This evidence was adduced at trial. At no time did Dr. Jones, prior to discharge by his own will, testify that he did not inform Jill that he suspected that she had a pulmonary embolism. Dr. Jones testified that he did not inform Jill that she had gastrointestinal bleeding. Dr. Jones further testified that he did not inform Jill he suspected she was septic. Dr. Jones testified that he did not inform Jill that she could die prior to discharge. Dr. D'Ambrosio, Plaintiff's emergency medicine expert, established, one, Dr. Jones had a duty to inform Jill of those risks. Two, that Dr. Jones, if Dr. Jones failed to inform Jill of those risks, that was a deviation from the standard of care. And three, Dr. Jones' deviation from the standard of care caused or contributed to Jill's death. Equally as important, if not more important, was the testimony of Dr. Jones' retained expert, Edward Ward, on this very issue. Dr. Edwards testified, if an emergency medicine physician such as Dr. Jones suspected Jill had a life-threatening illness, the standard of care required that physician to inform Jill prior to discharge. And I quote, yes, Dr. Jones suspected Jill had a life-threatening condition. The standard of care required Dr. Jones to inform Jill. Dr. Edwards lastly testified, quote, I did not see anything in the record as evidence that Dr. Jones informed Jill she had a life-threatening illness. So at this point, we have plaintiff's expert who established the requirements and the duties under the standard of care. We have defendant's expert who also testified to those very same duties. And we have the defendant himself testifying that he did not inform Jill of these life-threatening illnesses. Lastly, we have the court who said, and I spoke, and I quote, I do think there was sufficient testimony and there was testimony that the standard of care would have required the doctor to say certain things. I agree with defense. I do not think a separate instruction is appropriate. I will have an edit one line, which reads fail to adequately inform. That one line was then couched in the burdens instruction for the plaintiff. This error in conjunction with the other trial errors by the court substantially prejudiced plaintiff and denied plaintiff a fair trial and plaintiff respectfully request this court vacate the judgment and remand the case for a new trial on all issues. With regard to the second presentation on plaintiff's behalf, plaintiff met her burden in establishing the fundamental elements of a 5.01 instruction. Jill died from sepsis. One of the factors in diagnosing sepsis is the presence of bacteria in the blood. That is established through drawing blood and during the culturing process, if a bacteria rose out. As established at trial through plaintiff's exhibit number 58, days after Jill died, Mercy Hospital billed Jill's insurance for the diagnosis of sepsis. Despite this diagnosis of sepsis and being billed for it, Mercy Hospital denied at trial that Jill had sepsis and denied that there were any blood cultures that revealed Jill had sepsis. The blood culture results would have been determinative whether Jill had bacteria in her blood in vivo. In Simmons v., therefore, it was a highly contested issue in this case. In Simmons v. The University of Chicago, this court addressed the propriety of submitting a 5.01 instruction. This court held that when a disputed issue arises at trial and results from the predicament of a party, that party should not be permitted to benefit from the predicament that it created. This court considered five issues in determining the propriety of the issue instruction. First, this court looked at the employee of the defendant of the witnesses who had the most information on the issue. With the University of Chicago, it was their employees. The same is true with Mercy Hospital. Mercy Hospital touted two of its employees. Ruth had direct information and knowledge regarding the missing blood cultures. This court then in Simmons stated, concluded that since the witnesses were employees, they were under the control of the defendant. The same is true in this case with regard to Mercy. Mercy never denied that the employees were not under their care. Third, this court determined that the witnesses were not equally available to the plaintiff. The same is true in the Instant Case. In fact, in Schreiner v. Friedman, this court said, and I quote, an employee is just the type of witness which is not equally available to both plaintiffs due to the likelihood that such witnesses testimony would be expected to be favorable to the defendant. Fourth, this court determined that it was reasonable for the trial court to assume that the defendant would have presented the evidence through its agents if that evidence was favorable to the defendant. Plaintiff contends the same is true in this case. And lastly, and I quote, this court in Simmons said, the only testimony on a central issue in the case came from defendant doctors retained experts who reviewed the medical records. The same is true in the Instant Case. The only testimony on the issue of what happened, what could have possibly happened to the missing blood culture came from Mercy Hospital's retained experts. The missing evidence was in Mercy's control. Plaintiff established this at the time of trial. Jill was a patient in Instant Case of Care. It was Mercy's agents or employees that drew the blood and sent the blood to the lab. The missing evidence was not equally to both parties. Of course, plaintiff would not have had access to what happened to Jill's chain of custody. Mercy has never made any argument that the chain of custody was broken. We do know that blood was drawn. We do know that blood resulted not with the results of the blood cultures are not in the chart, but all other results for blood drawn at the same time appear in the medical record. There is no explanation whatsoever and none was offered at the time of trial as to why the blood culture results were missing. Similar to the reasoning applied to this court in Simmons, Mercy could have presented the evidence through his agents, Cryer and Dean Criss, who it touted was the most knowledgeable. Again, Mercy offered no explanation whatsoever for the missing blood culture results. The defendant's reliance and the court's reliance on Simmons v. Garces is misplaced. The difference between Simmons v. Garces and the Instant Case is that the defendant's agent and the defendant testified to explain the missing results. His agent, Sholanda, said that the reason the documents were missing is because they were placed in a temporary chart. It was only after the testimony of the defendant's agent that the court entertained the view of robust argument on inferences. Given plaintiff satisfied every element as outlined in her briefs, it was an abuse of discretion for the court to deny plaintiff's instruction. Counsel, please begin to wrap up your argument. Thank you, your honor. There is denial with other trial errors substantially prejudice plaintiff and denied plaintiff a fair trial. Plaintiff respectfully requests this honorable court vacate the judgment entered in the trial court and remand with verbal instructions to proceed to trial on all issues. Thank you, your honors. Thank you, counsel. Now we will, after each presentation, we'll ask our questions. So I'll go first to Justice Connors. Do you have any questions for affluence counsel? I do. I have some questions, counsel, relative to the informed consent offer of jury instruction on that. Is that where you said the court said there was sufficient testimony but agrees with the defense? Yes. Yes, justice. Now, let me ask you, who are the lawyers that objected? Both sides object? Both defendants object to that proposed non-IPA? Are you asking the defendants or me, your honor? I'm sorry. Can you repeat the question? I apologize. I apologize, your honor. I'm sorry. Yes, both defendants objected to the IPA instruction. Okay. And as far as the loss of chance issue, what was the basics that the trial court gave as far as that ruling? It did not give a basis. It just simply said it was a non-IPA. So no basis whatsoever? No, your honor. All right. When Dr. Noto testified as to the loss of chance doctrine, did he give his opinion relative to that to a reasonable degree of medical certainty? He did, your honor. He did not give, he could not give the exact timing. For instance, at 12 a.m. it would have made a difference. But his testimony with regard to the loss of time, the loss of chance doctrine was to a reasonable degree of medical certainty. Thank you. Now, can I ask you this question? Did you offer at any time IPI 105.01, which is the definition of professional negligence? Yes, we offered. Yes, I believe we did, your honor. Yes, we did. Okay. And was there any objection ever made to your proposed instruction relative to loss of chance ever objected to that it wasn't simple or brief or didn't comply to what the case law says as far as the non-IPI? No, there was no argument made that it was not simple or there was not brief or that it didn't comport with current case law. The only argument was that it was a non-IPI. Okay. Counsel, thank you. Thank you. Justice Harris, any questions for counsel? No, I do not. Thank you. Counsel, I have a question. Relative to the blood culture issue in the 5.01 instruction, during discovery, was there any discussion as to what Mercy's procedures were regarding when an order was made, whether it was carried out or not carried out? I couldn't find anything in your briefs or in the record regarding that. How did Mercy explain their procedures for carrying out a specific order? For example, when blood is drawn, many different tests may be done. Is there anything in the record that suggests that Mercy would have a way of identifying whether a test was done or not done from samples that were taken from the patient? Is that too complicated? I was trying to understand it, Justice Cunningham. My apologies. Let me ask it again. It's not clear to me that the blood that was drawn was actually cultured. Was there any testimony that cultures were actually taken from that blood sample? I know it was ordered, but were they actually done? That's my question. No, there was no testimony, Your Honor. Are we still talking about pre-trial? The court asked about depositions. There was testimony that the blood cultures were sent to the lab. That testimony was from a treating physician. That answers your question, I'm sorry. That's enough, thank you. Anything else, Justices Harris and Connors? No, thank you. Okay, great. Okay, counsel, you have reserved a few minutes for rebuttal. Let's go to Attalee's counsel. I didn't ask who was going to be arguing first, but between the two of you, you decide. Good afternoon, Justice Cunningham. We did decide, and just to advise the court, Mr. Walsh will be addressing questions related to informed consent after I finish. I'm going to be handling issues related or questions related to the lost chance issue and also to IPI 5.01. I will try to make it brief because I realize we are dividing our time. With that in mind, may it please the court, please state your name again, counsel, for each segment, because we are recording this. We want to be sure that we have it clear as to when you start, when the other one ended. So please state your name again before you start. Thank you. Of course, Your Honor. May it please the court, my name is Katherine Bosky-Weiler. I represent Mercy Hospital and Medical Center and Nurse Anderson in this appeal, and we ask that the court affirm the trial court's judgment and preserve the jury's verdict in this case. I'd like to start by asking a question about whether the trial court gave an explanation for the denial, and the answer is that the proposed non-IPI was rejected because it was the non-IPI instruction. That is because, as this court has specifically advised the trial courts, and I know the court is familiar with Sedera v. DeFillibo, but I want to quote it because it's important. This court has consistently affirmed refusals of similar proffered, non-standard instructions because IPI civil number 1501 properly states the law in lost chance medical malpractice cases, unquote. That's in Sedera v. DeFillibo, and it's worth, it's important to emphasize that in this case, 15.01 was given, and it was the long form, and that is in the record, it's at C-4372, volume 3. That's why the instruction was rejected, because the appropriate long form of 15.01 was given. That is sufficient pursuant to this court's precedent, and it was unnecessary to give a non-IPI on lost chance. Moving to my second point, which relates to the proposed missing witness instruction, it's crucial as a preliminary point here to look at the distinction between the facts of this case and Simmons v. University of Chicago, on which plaintiff relies heavily, Simmons v. University of Chicago, there are two key distinctions. One is that concerns missing witnesses. This is not a missing witness question. This is more as in Simmons v. Garces, a case of a missing, an allegedly missing piece of evidence. And secondly, Simmons v. University of Chicago was a case in which the court affirmed the decision of a trial court to give the 5.01 instruction. That's not what this court is considering. This court is considering whether the trial court here properly exercised its discretion in refusing to give a 5.01 instruction, and it did. It correctly exercised its discretion exactly as instructed in Simmons v. Garces. We're dealing with a proposed instruction that deliberately addressed results of blood cultures, and whether the results of those blood cultures could have been produced by the exercise of reasonable diligence. Here, they could not have been because there was no report. There was no evidence of that. Now, Justice Cunningham, you asked whether there was anything in discovery that concerned whether these cultures were ever actually done and whether a report was ever actually created. And the answer to that is no. And we know that for two reasons. One is Dr. Durrani Pragada, who was the ordering physician, did give a discovery deposition. It was discussed during motions in limine. And she stated, and this is the evidence that Dr. Sitrenberg relied on at trial, that the orders were probably discontinued. And if you look at the medical records, which I apologize to the court, as I mean this way, the medical records, at the record SEC C-1270, and throughout that entire section of the record, those are the medical records and they show very clearly numerous orders that Dr. Durrani Pragada ordered, but then were either canceled or discontinued for a variety of reasons. And there's testimony at trial why that happened. Ms. Milton Hamilton was coding. She was in severe distress. The physicians were doing everything they could to address her condition at the moment. And a number of these requested tests were at some point either discontinued or canceled. This is not a situation where the hospital refused to present some sort of evidence, documentary evidence, where the hospital failed to produce documentary evidence. This is a situation where those results did not exist at all. And that explanation was given very clearly to the trial court. That's why the trial court specifically found there was a reasonable explanation given for why those materials were not presented. And that is exactly what is required in order to avoid the giving of a 5.01 instruction. There needs to be, as the court is aware, the evidence needs to be under the The evidence cannot be available equally to either party. No reasonably prudent person would offer the, would fail to offer the evidence, and there is no excuse for the failure to produce. Here, Mercy Hospital has actually given an explanation for why there is no evidence to produce, why the evidence was not equally available to either party, and most importantly, Mercy Hospital has given a reasonable excuse for the failure to produce that evidence. It's because that evidence does not exist. It cannot be produced in that situation. And that's why, as under Simmons v. Garcia, there is a reasonable excuse for the failure to produce evidence. It has been given. The trial court's decision not to give the 5.01 instruction in that situation is an appropriate exercise of the court's discretion and should be affirmed. I realize, again, because our time is being divided, I'm going to defer the rest of my time to Mr. Walsh. I don't know if the panel would prefer to ask questions on these topics now or wait until the end. We prefer to ask after the conclusion of each attorney's presentation. So are you done, counsel? Yes, I am, Your Honor. With that, we ask that the court affirm. Thank you. So first, Justice Connors, do you have any questions for counsel? I do. And counsel, you're doing loss of chance. The other counsel is not doing any loss of chance. That's correct, Your Honor. Okay, was some testimony offered by plaintiff's witnesses relative to the doctrine of loss of chance. Is that right? Yes, Your Honor. We don't agree that it's sufficient, but we agree that it was given. I understand that. But was there any testimony that was presented that was counter to the application of the doctrine of loss of chance from your side or from the other defendant? Our understanding of the doctrine of loss of chance is there needs to be an explanation of exactly what the context is, meaning when is the final opportunity to make a difference in the care that's being given to the patient? And how has the situation changed negatively for the plaintiff? None of that testimony came in at trial as we understand. Yeah, counsel, they gave some evidence on loss of chance, no question about it. But what evidence did you present or the other defendant? That's my question. You didn't present any or you did? Please tell me. And I apologize to the court. I'm not trying to avoid the question. I think the evidence was that there was no deviation from the standard of care. And at that point, loss of chance is not an issue. Okay, that's appropriate response. Let me ask you this. In the Holton case, which I'm sure you're aware of, and let me say before I go into Holton, I've read all those cases on loss of chance. And I know the status of the law in Illinois is that you only give the proximate cause instruction. Do we agree on that? We do, your honor. Yes. Yes. In Holton, though, that gives a pretty good definition of the loss of chance doctrine. It uses the terms negligent deprivation in regard to increase of unfair outcome, et cetera, et cetera. Now, that seems like a very important two word connotation there. The words negligent deprivation, the jury didn't know anything about that, did they? About negligent deprivation? Correct. They were instructed on that is my question. The jury was instructed, and again, Justice Connors, I'm not trying to avoid your question. I want to make sure I understand that the jury was instructed using the proximate cause instruction. To the extent that negligent deprivation is included in Holton, I don't know that the jury was instructed using those words because the non-IPI that was proposed wasn't given to the jury. Am I answering the court's question? Well, kind of. But my point is that how would a jury know? A number of laymen that don't know the law and don't know medicine would know what the loss of chance doctrine really, the proper terms to use, or what is proximate cause? How would they know any of those things? Because the jury is being told exactly what proximate cause is. That's the definition that's being provided in the long form of 1501. And that's why it's important to note, as I mentioned earlier, that the long form was given to the jury. It's that second sentence of the long form of 1501, the IPI 1501, that says, it need not be the only cause nor the last nor nearest cause. It is sufficient if it combines with another cause resulting in the injury. I would submit to the court that that language is actually more straightforward than a concept like negligent deprivation, which seems a much more technical definition and much more difficult to understand than the straightforward language in 1501 that has been repeatedly approved by courts, including, as the court knows, this one. Thank you, counsel. That's all. Justice Harris? No, thank you. Okay. Counsel, I have a question regarding when your 5.01, the failure to give the 5.01 instruction. Does Mercy have a carried out? I don't know that there is a process or a procedure or evidence of, for example, a procedure requirement that was submitted at trial. There is deposition testimony from Ruth Cryer and Mr. Crist, who were the lab technicians, who emphasized, and this was discovery deposition to be clear to the court. They emphasized that when samples are given with orders, specific are processed. However, if they are not given those instructions, so if there is a blood draw, but the order doesn't make its way to the lab about what is supposed to be done with that sample, or if nothing makes its way to the lab, meaning an order or a sample, then nothing is done for what are, I think, obvious reasons. There's nothing to process. There's no information about what to process, and there may not be any material to process. Thank you. Justice Cunningham? I'm here. The internet connection sometimes keeps going in and out. Can you hear me? Yes, Your Honor. We can. Okay. Well, it seems to me from reading what Mercy's witness testimony seems to be that here is what most likely happened, that it was most likely discontinued. Is that sufficient to overcome the elements that they had complete control over, the lab test, the order, the results of the order, whether the blood was drawn, what happened to those results? The plaintiff had no way of controlling that, but Mercy did, so the testimony that this is most likely what happened sounds very speculative to me. Can you comment on that? Yes, Your Honor. It's sufficient for three reasons. First of all, that testimony is the testimony given by Dr. Sitrenberg during trial. It needs to be considered in addition to the trial testimony given by Dr. Durrani-Pregada, which was presented to the trial court as foundational to whether or not it would be appropriate to give a 501 instruction, and it also needs to be considered in the context of any other evidence in this case. There is no evidence that suggests that there was any sort of a test result achieved through this blood work. On the contrary, the medical records were submitted. They are in the record. We've pointed the court to those. This is not a situation where there has been a suggestion that somehow records were not produced, that something was omitted from the records. They've been produced. They are here, and that information is not in the records. We can see why, and that's the third point, because in these records, it's clear that a variety of orders, if to the extent that they were given, were discontinued or were canceled, and in that situation, there would not be anything else to put into the record, and actually, I think Simmons is actually really helpful. Simmons v. Garces is really helpful on this particular point, because there is discussion of the fact that a temporary medical chart was created in Simmons. There's discussion about whether the height and weight of the infant who was at issue in the case was taken. There's testimony that, yes, that information was taken, but it was put in a separate record, and that record wasn't retained. I think you've answered my question. Thank you. Very good. Thank you, Your Honor. Anything else from Justices Harris and Connors? No. Can you see me, because I've lost my picture? We can see you, Your Honor. Yes, Your Honor. All right. I can hear you. I can see you, so fine. Thank you. Okay. Thank you, counsel. Thank you, Your Honors. May it please the Court. Justice Cunningham, my name is Michael Walsh. I represent the Appalese EMP of Chicago, LLC, and the four board-certified emergency medicine physicians that treated Joe Milton Hampton back in March of 2012 on the 16th and 17th. I'll be addressing a couple of issues. It looks like the first one, though, most importantly, would be the issue with respect to the informed consent question that this Court seems to be interested in. The Court should know that this case lasted a month. There were 17 retained experts in a wide area of medicine, including infectious disease, cardiology, emergency medicine. We had a thoracic surgeon, etc. It's all in the briefs. The question really boiled down to two issues here. One was, did Joe Milton Hampton die from a toxic shock syndrome, a bacterial infection that should have been timely diagnosed and treated with antibiotics? And everyone agrees that under those circumstances with toxic shock syndrome, the treatment is to remove the nidus of infection, i.e. the tampon, and to give antibiotics. The other theory of the case expressed by the defendants in this matter is that Jill died from a fulminant viral myocarditis, likely related to gastroenteritis. She did not have a fever. She did not have shortness of breath. She did not have any rashes. And as the Court probably notes in the plaintiff's radiology experts and Dr. Noto and Dr. Jacobs, they all said the key for this case is a tampon in the vagina because that's the nidus of infection that caused the bacterial infection, which led to her death. And that is why timely diagnosis and treatment was essential. Everyone no tampon in the vagina. The Dr. Gobey and the radiologist doesn't know his anatomy and identified the urethra and not the vagina. The vagina was empty. The patient had no fever. The patient had no rash, despite Dr. Noto's reference that the rash was probably hidden because she was dark skin complected. That led to issues with respect to the CDC guidelines on what is and what not to do. Dr. Reingold's involvement in the case, the plaintiff also had an objection to. But turning the attention to the informed consent theory, what plaintiff is not mentioning is Dr. Jones didn't know exactly what was going on with this patient when she wanted to leave after receiving two doses of IV fluids and some Zofran. There was a broad spectrum of possibilities and that is why Dr. Jones said to the plaintiff's decedent, stay here. He didn't say it just to her. There was also a nurse present as well as plaintiff's decedent's husband or ex-husband. A long discussion was brought out about the risks of her leaving the facility. She did not want to say she felt better. That's why Dr. Jones's note is so extensive in the records that I cited in the briefs. As it relates to plaintiff's overarching theory in this particular case, again it is timely diagnosis and treatment of a bacterial infection. The judge did not give the informed consent instruction because it was speculative with respect to whether she's established enough evidence to have that, particularly on the issues of causation that if she was given this information would it have even changed her position on this. She wanted to go home as reflected in the contemporaneous note by Dr. Jones. Plaintiff's counsel's reliance upon Doe versus the University of Chicago. It is an informed consent case, but that is with respect to giving a kidney to a patient who previously rejected two other kidneys because of the patient's prior medical history. Had she known that the kidney that she accepted was from a homosexual male, she would never have accepted it. The problem in that particular case wasn't the informed consent. It was a 50.01 instruction regarding agency. That isn't the question here. The question here is the overarching argument by plaintiff's counsel on their theory of the case that Jill Milton-Hampton died from bacterial sepsis caused by a retained tampon. Our defenses were the opposite and the judge in hearing the overarching theory of plaintiff's case with respect to bacterial infection and the toxic shock syndrome presentation said to her, there's some evidence to that. I'm going to put it into your various other theories of liability in this particular case, including the delayed diagnosis of this patient's supposed toxic shock syndrome and the delay in providing her with antibiotics because none were ever given. That's why I think the judge did what he did because that was more of an ancillary theory based upon hypothetical speculatory questions that were asked of Dr. Jones and Dr. Edward Ward. The problem with the scenario that plaintiff is couching is Dr. Jones didn't know what was going on with this particular patient. At the time the patient left against medical advice or against his recommendation, he had just received urinalysis results that suggested that this patient did not have an infection, that she was responding to fluid administration. There is a broad spectrum of potential possibilities of what's going on with this particular patient that required further assessment, evaluation, and observation of Jill Milton-Hampton. She elected not to do that. When she came back the following day on the 17th of March, a CT scan was performed. She didn't have a PE. She didn't have a GI bleed. She had what's called a heterogeneous density in her vaginal area and Dr. Arwin Decker, the emergency medicine physician, said that that could be suggestive of clots. Dr. Gobian, the plaintiff's expert in radiology said, no, no, no, that's a tampon, and he pointed to the urethra. The defendants experts in radiology pointed out to the jury in displays of anatomy that Dr. Gobian was mistaken and was looking at the urethra and not the vagina. We discounted all of the theories with respect to whether this was toxic shock syndrome. That is why that informed consent instruction was not necessarily given by the judge, but he did include that into the plethora of theories that plaintiff had regarding this particular case and how the defendants, not just Dr. Jones, but Dr. Heinrich, Jones, Connelly, Arwin Decker, and even the hospital's resident deviated from the standard of care. In essence, they delayed and failing to diagnose toxic shock syndrome, delayed in finding the infection and providing the patient with antibiotics. The alternative theory was embraced by the jury, and that's why the jury came down with its rationale. With respect to Dr. Noto's testimony and Dr. Jacob's testimony and Dr. Gobian's testimony about the presence of the co-defense counsel retained Dr. Gore, who's up at North Shore. We also utilized Dr. Arthur Reingold, who is an epidemiologist. Plaintiff's theory against firing Dr. Reingold was that he is not a clinician and therefore can't testify, but under Illinois Evidence Rule 702, if he can provide expert testimony to help educate the jury, that's fine. The judge let him testify, and Dr. Reingold was uniquely qualified in this particular case because he sat on the CDC board on when the toxic shock syndrome breakout happened back in the 70s and 80s. They had a classification of what constitute toxic shock syndrome that was utilized by the medical facilities and even referenced by Dr. Noto on several occasions on why this was toxic shock syndrome. Plaintiff obviously had the right and did cross-examine Dr. Reingold that he is not a clinician, he's not treating patients, but he was expert with respect to what constitute toxic shock syndrome under CDC guidelines. Counselor, please begin to wrap up your remarks. And for all those reasons, we ask you to affirm the trial court's decisions with respect to what Judge Lyons did, that he did not abuse his discretion in any way, and to let the jury decide the facts of the case and be the arbiter of the credibility of the witnesses as they did in this particular case. I thank you very much for your time. Thank you. We'll go first to Justice Connors. You have questions for counsel. Thank you. Counselor, did you say that the court said it was speculative as to the of the informed consent instruction? He didn't use the word speculative, but the problem that they had is that it was redundant with respect to the diagnosis of... I'm asking what the court said. What did the court say? He said there was some evidence enough to put that into the issues, to have it a theory in the issues instructions, but he would not give the informed consent. I think the belief was the informed consent issue was more on or more directed to whether to give a procedure to a patient and whether the patient is advised of what those procedures would entail with respect to risk and benefit. Counselor, I only asked what the judge said, not what your impression of it was, but anyway, let's go back. In the IPI 105.07, it does have the heading of procedure battery. Is that right? True. It does, your honor. And wasn't the objection that was made based on the fact that, oh, these instructions have to do with battery. Isn't that the objection that was made? That was one of the issues that that wouldn't be the appropriate instruction because it had to do with battery and it didn't have to do with negligence, I think, into the comments that was referenced. Well, again, that was the objection that was made. These have to do with battery. This whole section has to do with battery, right? That was one of several. That was the one that, well, anyway. All right. So section IPI 105.07.01 is the informed consent that was denied, right? I believe so, your honor. Yes. Yeah. And then it goes on to 105.07.02, which is informed consent as to the pleadings, and 105.07.03, informed consent as to the burden of proof. Now, do any of those talk about at all anything about battery in them? Not to my knowledge, your honor, but I know that the informed consent argument was not pled in the complaint. Either way, it was offered. And what I'm saying is the objection was it has to do with battery and none of those provisions after 07, that being 0.01, 0.02, and 0.03 have anything to do with battery, correct? To my knowledge, I think you're correct, your honor. Right. Thank you. That's all. Thank you. Justice Harris? No, thank you. No question. I have a quick question for you, counsel. Given the apparently complicated clinical picture that the plaintiff's decedent presented with, what harm would it have been to give the more expanded version of the informed consent instruction? It seems like everybody talked about battery, but I think we can all agree that this had nothing to do with that, but the plaintiff's decedent really had a complicated clinical picture. So under those circumstances, wouldn't it have been more appropriate to give the instruction that the plaintiff asked for? To the extent it had to do with a battery, it wouldn't apply. To the extent that it has to do with the delay in care and treatment, it's redundant, judge. I think it's been encapsulated in the proximate cause instructions and the various theories of negligence expressed in the jury instructions against the defendants. You think it's redundant? Delayed in diagnosing and treating what plaintiff's counsel considered to be toxic shock syndrome. Okay. Thank you. Thank you, your honor. Rebuttal, brief rebuttal. You reserve five minutes and you don't counsel. You don't have to use all five, but we ask you to make your rebuttal in response to what your opponents raised and nothing new. Although we're on Zoom, I think it's important to remind you of that. Please proceed whenever you're ready. Thank you so much, your honor. First, I want to address Justice O'Connell's question to counsel. The court never said that there was speculation. The court said with regard to the informed consent constructions, and I quote, I do think there was sufficient testimony and there was testimony that the standard of care would have required the doctor to say certain things. I agree with the defense that there's a separate instruction. It's not necessary. I will give you one line. That means one line on the failed, on the informed consent instruction. I will give you one line and you can say that he failed to adequately inform Jill. Plaintiff, the problem with that is that it is an inaccurate statement of the law on informed consent and it is a hybrid instruction. It's a modified instruction and so it did not inform the jury that they could consider whether Dr. Jones had a duty to inform Jill. It did not inform the jury that if Dr. Jones failed in that duty and it was established that that failure approximately caused harm, that he could be liable for that. So none of that was in the instruction. With regard to the testimony today that Dr. Jones did not know what was going on, there was a lot of things going on, let me tell you what we do know. We do know what Dr. Jones testified to at trial. Dr. Jones testified that at that time, the time that he was caring for Jill, he believed that she had three life-threatening illnesses, pulmonary embolism, sepsis, and gastrointestinal bleeding. So we do know that if we know nothing else. And that testimony was entered at trial and his failure to inform Jill of those risk factors was a complete deviation from the standard of care as was established by the evidence. With regard to Jill leaving on the morning of March 17th, two things. One, testimony established that she was under the influence of morphine at that time. Testimony also established that she did not sign out against medical advice. Mercy had a separate protocol in place so Jill didn't leave against medical advice. Jill left with the discharge instructions of the instructor to return if she got worse, which she of course did, and she subsequently died. With regard to the 5.01 instruction, with regard to the 5.01 instruction, there was no evidence adduced at trial from any agent of through Mercy's retained experts. Dr. Deepa did not testify at trial. She did not. So there was no testimony from that treating physician. No nurse testified at trial to explain what happened to the missing blood cultures. Mercy repeatedly touted, it is, the hearing transcripts are replete. Mercy repeatedly touted that it had the two individuals, the head of the about this and they knew what happened to the blood cultures. Well, that's hearsay. That did not come in at trial. And as for any testimony offered by Dr. Centenberg as raised by counsel, that's hearsay again. The only thing Dr. Centenberg did was read from the depositions and talk about what he think may have been in the mindset of pre-trial witnesses. That is not sufficient to overcome the inference that was made. We do know that the blood that was drawn at the exact same time was in the chart. The blood cultures are missing. The only thing that could prove her disproved case is missing. We do know that while there was this army of experts to say that Jill didn't have sepsis days after Jill's death, we do know that Mercy billed for sepsis as plaintiffs exhibit number 58, which was published to the jury. So these are facts that we do know. So it's not shocking to me that the blood culture results that could prove one way or the other are missing. With regard to the record indicating that the blood cultures results were canceled. Thank you so much. Lastly, no timing whatsoever in the record on when it was discontinued supposedly or when it was entered by the trial court. Remand this case to trial and allow the case to proceed with a new trial on all issues. And I thank the court for its time. Thank you. One second. Yeah. Counsel for the plaintiff. Did you argue loss of chance in your closing argument to the jury? Yes, we did. Thank you. Thank you. Justice Harris. No questions. Thank you. Okay. All right. Thank you to all all three lawyers for very spirited presentation. This matter will be taken under advisement and we will issue a ruling in due course. The court stands adjourned. Thank you.